## REYNOLDS *v.* THE STATE, EX REL. TITUS.

CONTESTING ELECTION.—*Quo Warranto.*— *Information by Prosecuting Attorney.*—An information by a prosecuting attorney, filed against an alleged usurper of a public office, need contain simply a plain statement of the facts which constitute the grounds of the proceeding,·addressed to the court, alleging the name of the person rightfully entitled to the office, and averring his right thereto.

SAME.—*Information by Contestor.*—An information may, in such case, be filed by any person who claims an interest in such office; but it must contain, not simply the statement required in an information filed by a prosecuting attorney, but allegations showing his interest in the matter, stating all the facts necessary to establish the conclusion of law, that he is entitled to the office.

SAME.—*Necessary Averments.*— *Eligibility.* — An information, in such case, filed by one who claims to have been elected to a public office, at a particular election, as the successor therein of the alleged usurper, must show, that, at the date of his alleged election, he was eligible to such office, and that he had received the highest number of votes then cast.

SAME.—*Practice.*—*Demurrer.*—*Motion to Make Certain.*—Where the informa-

Reynolds *v.* The State, *ex rel.* Titus.

tion simply avers a material fact in an uncertain or indefinite manner, the defect is reached by a motion to make it more certain; but where such fact is entirely omitted the defect is reached by demurrer for insufficiency.

SAME.—*Argumentative Denial.—Harmless Error.—*Where the matters alleged in a paragraph of answer, in such case, amount only to an argumentative denial of the facts alleged in the information, they can be given in evidence under the general denial; and, where the latter is pleaded, the sustaining of a demurrer to the former is harmless.

SAME.—*Counter-Claim.—Counter-Information.—*Where an answer is filed to such an information, in the nature of a counter-claim or counter-information, alleging the defendant's right to such office, as his own successor, by virtue of an election, it must aver the facts as to his election and eligibility, as fully as the same ought to be averred in the information.

SAME.—*Action.—*An information in the nature of a *quo warranto* is a civil action.

SAME.—*Trial by Jury.—*Either party to such procceding is entitled, as of right, to demand a trial by jury.

SAME.—*Refusal of Trial by Jury.—*The refusal of a court to grant a trial by jury to a party entitled to and demanding it is a substantial error, notwithstanding the fact, that, by the record, it appears that substantial justice was done.

SAME.—*Evidence.—Ballots.—*In all cases wherein the right to an elective office is the subject-matter of an action, whether in a statutory proceeding to contest an election, or in a proceeding in the nature of a *quo warranto,* the ballots cast by the electors at such election, when preserved according to the statute, and properly identified, are the primary and original evidence by means of which the result of such election is to be determined.

SAME.—*Statement of Board of Canvassers.—*The statement and declaration of the result of a general election, made by the board of canvassers, are, at most, merely *prima facie* evidence of the result.

From the Boone Circuit Court.

*T. J. Terhune, C. S. Wesner, C. Baker, O. B. Hord* and *A. W. Hendricks,* for appellant.

*S. H. Buskirk, J. W. Nichol, W. B. Walls* and ——— *Palmer,* for appellee.

HOWK, J.—In this action the relator of the appellee, the plaintiff in the court below, on the 9th of April, 1877, filed an information, in the nature of a *quo warranto,* against the appellant, as defendant, in that court.

Omitting therefrom the venue, the title of the cause

and the signature of counsel thereto, we set out a copy of the information, as follows:

"The State of Indiana, on the relation of Nathaniel C. Titus, gives the court to understand and be informed, that, on the 8th day of October, 1874, Edward Reynolds was duly and legally elected by the qualified voters of the county of Boone and State of Indiana, sheriff of said county of Boone, in the State of Indiana, who was duly commissioned by the Governor of said State, gave bond, took the oath of office and entered upon the discharge of his duties as such sheriff; that, under and by virtue of the constitution and laws of the State of Indiana, the said Edward Reynolds was entitled to hold the said office of sheriff for and during the period of two years from the 2d day of November, 1874, and until his successor was duly elected and qualified; that, at the general election held in the county of Boone, in the State of Indiana, on the 10th day of October, 1876, the relator, Nathaniel C. Titus, was duly and legally elected sheriff of the said county of Boone, in the State of Indiana, by the legal and qualified voters of the said county; that he was, on the 16th day of February, 1877, duly and legally commissioned as such sheriff by the Governor of the State of Indiana; that, on the 21st day of February, 1877, and within the time provided by law, he took the oath of office prescribed by the constitution and laws of the State of Indiana, which oath was entered upon the commission issued by the Governor of the said State; that, on the 19th day of February, 1877, and within ten days after he received the commission of the Governor of the said State, he executed to the State of Indiana a bond in the penalty of five thousand dollars, conditioned as required by law, with Eli P. Baker, John S. Peters, George W. Baird, Adolphus Wysong, William H. Dickerson, James Nealis, Samuel S. Daily, Richard Brand, Levi W. Rains, John C. Daily, John M. Ball, John W. Hedges, John Adair and Martin

C. Kleizer as his sureties, all of whom were resident free-holders of the said county of Boone, in the said State, and were worth, in the aggregate, the sum of one hundred thousand dollars; that said bond was duly signed, sealed and acknowledged before W. B. Walls, a notary public within and for said county of Boone, and that the said bond was, on the 19th day of February, 1877, presented to the board of commissioners of said county when in open session, for their approval, and that said board illegally and wrongfully refused to act thereon; that the said relator, Nathaniel C. Titus, on the 22d day of March, 1877, demanded of the said Edward Reynolds, that he should surrender and deliver up to the said relator the said office of sheriff, together with all the books and papers in any manner appertaining to said office, who illegally and wrongfully refused so to do, but usurped and intruded into the said office of sheriff, and from the day aforesaid has illegally and wrongfully held the said office, to the great prejudice, damage and injury of the said Nathaniel C. Titus, the relator, in the sum of ten thousand dollars, who alone, according to the constitution and laws of the State of Indiana, is the sheriff of said county, and entitled to exercise the functions and perform the duties thereof.

"Wherefore the said relator prays that due process of law may be awarded against the said Edward Reynolds, in this behalf, to compel him to answer and show by what authority he claims to usurp, hold and exercise the office aforesaid, and that the relator have judgment for the sum of ten thousand dollars, for the unlawful holding of said office, and all other proper relief."

The appellant demurred to the information, for the following grounds of objection:

1. Because the appellee had no legal capacity to sue, prosecute or maintain his action;

2. Because the complaint did not state facts sufficient to constitute a cause of action;

3. Because there was a misjoinder of parties, in this, that Henry C. Wills, prosecuting attorney within and for the Twentieth Judicial District of the State of Indiana, should be a party plaintiff and relator in said cause; and,

4. Because the court below had no jurisdiction of the subject-matter.

This demurrer was overruled by the court below, and to this decision the appellant excepted.

The appellant then answered in five paragraphs, the first of which was a general denial. We give the other paragraphs of the answer as we find them set out in the appellant's brief, having compared them with the record, and finding them substantially correct.

The second paragraph averred: " That he admits that the relator did obtain what purported to be a commission as sheriff of said Boone county, and that the same was issued by the Governor of the State of Indiana, but he says that the Governor issued said commission without any authority or evidence of the election of said relator to the said office of sheriff of Boone county; that, in truth and in fact, said relator had not been elected or appointed sheriff of the county of Boone at the time the Governor issued said commission, all of which the Governor, at the time he issued said commission, well knew, and all of which facts fully appeared by the statement of the clerk of the Boone Circuit Court on file in the office of the Secretary of State in and for the State of Indiana, at the time the Governor issued said commission, specifying the number of votes received by the relator for the said office of sheriff of Boone county; that, in truth and in fact, the said Edward Reynolds was, on the 10th day of October, 1876, duly and legally elected sheriff of Boone county, Indiana, and was so declared elected by the board of canvassers in and for said county of said election, all of which fully appears in the tabular statement and declaration of said board of canvassers, and the certificate of the clerk of the Boone Circuit Court, a copy

of each of which is filed herewith, and made part of this answer. See exhibit marked 'A' and exhibit marked 'B.'

" That, on the said tenth day of October, 1876, the said Edward Reynolds was, and ever since has been, and now is, eligible to the said office of sheriff of Boone county; that, by reason of so being elected, he is entitled to the office of sheriff of said county of Boone, and to exercise the functions, perform the duties, and receive the perquisites and emoluments of said office."

The third paragraph averred, " That, at the general election to be holden on the second Tuesday of October 1876, for the State of Indiana, it became and was necessary to elect a sheriff in and for the county of Boone in said State; that, on said day, to wit, on the tenth day of October, 1876, an election was held in said county of Boone aforesaid, in pursuance to the laws of said State of Indiana; that, on said tenth day of October, 1876, Edward Reynolds, the defendant, was, ever since that time has been and now is eligible to the said office of sheriff of Boone county aforesaid; that, on the said tenth day of October, 1876, the said Edward Reynolds, defendant as aforesaid, was a candidate for the said office of sheriff; that, as such candidate, he received two thousand five hundred and four legal votes and ballots; that the said Nathaniel C. Titus, the plaintiff herein, was a candidate at said election for said office; that, as such candidate, said Nathaniel C. Titus received two thousand four hundred and sixty-four legal votes and ballots, and no more; that, at said election aforesaid, one James H. Cramer was a candidate for said office of sheriff; that, as such candidate, the said James H. Cramer received one thousand and sixty-six legal votes and ballots, and no more.

" That, as such candidate, the said Edward Reynolds received the largest and greatest number of legal votes and ballots that were given, cast and deposited in the various ballot-boxes in the several townships and voting precincts

in said Boone county aforesaid, for any one person for said office of sheriff, at said general election aforesaid; that, in truth and in fact, the said Edward Reynolds was, on the said tenth day of October, 1876, duly and legally elected sheriff of Boone county, in the State of Indiana; that, on Thursday after the said second Tuesday in October, 1876, the board of canvassers in and for the county of Boone aforesaid, met at the clerk's office of the clerk of the Boone Circuit Court, and, after having duly organized by calling James W. Garner, one of their number, to the chair, with Jesse Neff, the clerk of the Boone Circuit Court, as their clerk, they did proceed to declare, and did declare, this defendant duly elected sheriff of Boone county; that, notwithstanding all these facts, the Governor did issue a commission to the said Nathaniel C. Titus, plaintiff and petitioner herein; that the said Governor issued said commission without any evidence of the election of said plaintiff to said office of sheriff of Boone county; that said commission is void, and of no force and effect whatever; that, in truth and in fact, said relator had not been elected or appointed sheriff of the county of Boone at the time the Governor so issued said commission, all of which the Governor, at the time he so issued said commission, well knew. Wherefore defendant prays, that he be adjudged and declared the duly and legally elected sheriff of said county of Boone, and have all other and proper relief."

The fourth paragraph averred, that he " admits, that, on the twenty-first day of February, 1877, the said Nathaniel C. Titus received from the Governor of the State of Indiana a pretended commission to the office of sheriff within and for the county of Boone, in the State of Indiana, but says that said pretended commission is false and fraudulent, and was issued without authority of law; · that said Nathaniel C. Titus, relator herein, was not duly and legally elected to the said office of sheriff within and for said county of Boone, in the State of Indiana, at the

general election held in said county and state, on the tenth day of October, 1876, by the qualified and legal voters of said county; that the board of canvassers of said election, whose duty it was, by virtue of the laws of the State of Indiana, to declare the person having received the highest number of votes given for said office of sheriff within and for said county duly elected, and duly certify the same in pursuance of the statutes of the State of Indiana in such case made and provided, duly and legally constituted, and organized with the clerk of the Boone Circuit Court acting as the clerk of said board of canvassers, and assembled at the court house of said county, on Thursday next succeeding said election, between the hours of ten o'clock A. M. and six o'clock P. M., did not declare and certify the said Nathaniel C. Titus, relator herein, elected to said office of sheriff within and for said county of Boone; that the clerk of said board of canvassers and the clerk of the Boone Circuit Court, whose duty it was, by virtue of the statutes of the State of Indiana, in such cases made and provided, to make out a statement under his hand and the seal of the circuit court, after ten days and within twenty days from the time the said board of canvassers had made their return, specifying the number of votes given to each person for said office, and transmit the same to the Secretary of State within and for the State of Indiana, within the time aforesaid, did not make out a statement under his hand and the seal of said circuit court, or in any other form and manner, after ten days and within twenty days from the time the said board of canvassers had made their return, or at any other time, specifying that the said Nathaniel C. Titus had received the highest number of votes for said office of sheriff within and for said county of Boone, and that he had been elected to said office, and did not transmit the same to the Secretary of State within and for the State of Indiana, within the time aforesaid, or at any other time.  That the Governor of the State of

Indiana did not issue said pretended commission to the. said Nathaniel C. Titus, relator herein, upon any other or different authority whatever. And that the said Nathaniel C. Titus has no other right or title to said office of sheriff within and for said county of Boone aforesaid, except by virtue of said pretended commission. And the said Edward Reynolds, respondent herein, further says, that heretofore, to wit, on the eighth day of October, 1874, he, the said Edward Reynolds, was duly and legally elected by the qualified voters of said county of Boone, in the State of Indiana, sheriff of said county, and was duly commissioned by the Governor of said State as such sheriff, who duly and legally qualified by executing his official bond, in the sum of $——, to the State of Indiana, and took the oath of office, as required by him, and entered upon the duties of said office, and has been ever since, and now is, acting as such; and that, by virtue of being so elected and qualified and entering upon the duties of the said office, the said Edward Reynolds was and is entitled to hold said office of sheriff for two years from the —— day of October, 1874, and until his successor should be elected and qualified, and that no other or different person has been elected to said office of sheriff within and for said county of Boone and State of Indiana. Wherefore defendant prays that he may be adjudged and declared to be legally entitled to hold said. office of sheriff, and for all other proper relief."

To each of the second, third and fourth paragraphs of the appellant's answer the appellee demurred upon the ground that it did not state facts sufficient to constitute a defence to the action; which demurrers were sustained as to the second and fourth paragraphs, and to these decisions the appellant excepted; and the demurrer to the third paragraph was overruled.

The appellee replied to the third paragraph of answer:.

1. A general denial; and,

2. A special reply, to which appellant's demurrer, for the want of sufficient facts, was sustained.

The issues joined were tried by the court below, before a special judge thereof, and a finding made in favor of the relator of the appellee, and judgment was rendered accordingly. The appellant's written motion for a new trial was overruled by the court below, and to this decision he excepted. The evidence on the trial is properly in the record.

In this court the appellant has properly assigned, as errors, the following decisions of the court below:

1. In overruling his demurrer to the information or complaint of the appellee's relator;

2. In sustaining the demurrer of the appellee's relator to the second paragraph of the appellant's answer;

3. In sustaining said relator's demurrer to the fourth paragraph of appellant's answer; and,

4. In overruling the appellant's motion for a new trial.

Before proceeding to the consideration and decision of the important questions presented by the record of this action and the errors assigned thereon, it is proper that we should acknowledge our obligations to the distinguished counsel of the parties, for the invaluable aid afforded us by their able and exhaustive briefs of this cause. Their learning and industry have materially assisted us in our examination of those questions, and it is due to them, and a pleasure to ourselves, that we make this acknowledgment.

The first alleged error, complained of by the appellant in this court, calls in question the sufficiency of the facts stated in the information of the appellee's relator to constitute a cause of action. Other grounds of objection were assigned in appellant's demurrer to the information, but in this court the fifth statutory cause of demurrer alone is apparently relied upon by appellant's counsel.

This action or proceeding is authorized by, and was

evidently commenced under, the provisions of article 44 of "An act to revise, simplify and abridge the rules, practice, pleadings and forms in civil cases in the courts of this State," etc., approved June 18th, 1852, commonly called the practice act. In section 751 of this act it is provided as follows:

"Sec. 751. The information shall consist of a plain statement of the facts which constitute the grounds of the proceeding addressed to the court." 2 R. S. 1876, p. 299.

The question for our decision, therefore, is this: Did the information in this case contain "a plain statement of the facts which constitute the grounds of the proceeding?"

As shown upon its face, the information addressed to the court below in this case was filed by the relator of the appellee, to determine his right or title to the office of sheriff of Boone county. The information was filed against the appellant, as defendant, upon the ground, as alleged therein, that he had "usurped and intruded into the said office of sheriff," and had "illegally and wrongfully held the said office," since "the 22d day of March, 1877."

Such an information might be filed by the prosecuting attorney, in the proper circuit court, upon his own relation; but it is also provided in the last clause of section 750 of the practice act, that it may be filed "by any other person on his own relation, whenever he claims an interest in the office, * * * which is the subject of the information." 2 R. S. 1876, p. 299.

When, however, as in this case, the information is filed by any other person than the prosecuting attorney, it is expressly provided, in the last sentence of section 752 of the code, that such other person "shall show his interest in the matter." 2 R. S. 1876, p. 300.

Under these provisions of the practice act, it was certainly incumbent upon the appellee's relator, in this case, that, in his "plain statement of the facts," he should, by

proper averments, " show his interest " in the office which was the subject of his information.

The marked difference between an information filed by the prosecuting attorney of the proper circuit court and an information filed by any other person, in such a case as the one now before us, is so clearly and pointedly expressed in section 752 of the code, before cited, as to be worthy of especial notice. It will be seen, that, when the prosecuting attorney files an information against a person for usurping an office, " he shall also set forth therein the name of the person rightfully entitled to the office, with an averment of his right thereto;" but, when the information is filed by any other person, the requirement of the statute is clear and positive, that " he shall show his interest in the matter."

In the former case, when the State, by its prosecuting attorney, was the only moving party against an alleged usurper of a public office, it is only required that the prosecutor should set forth in the information the name of the person entitled to the office, with an averment of his right thereto; and it would seem to follow, that, in such case, the alleged usurper must show very clearly his right and title to the office in controversy.

But, in the latter case, where the State, by its prosecuting attorney, is not a party to the suit, but the controversy is strictly a private one between two or more persons, as to which one of the number has the better right and title to a public office, then our statute imperatively demands that the moving party, in his information filed, " shall show "—not merely allege or aver—but " shall show his interest in the matter" which is the subject of his information. In other words, it seems to us, that, in this latter case, the relator's " plain statement of facts," and not conclusions, must be such as would show, if sustained by the evidence, his right and title to the office in controversy, as against the defendant or defendants named in the information.

It is earnestly insisted by the appellant's attorneys, in the case at bar, that the appellee's relator, in and by the averments of his information, has failed to state the necessary facts which would show his interest in the office which was the subject of his information. It seems very clear to us, that this objection to the relator's information is well taken. The relator has averred, in substance, that he was duly and legally elected to the office of sheriff of Boone county; that he had been duly and legally commissioned as such sheriff by the Governor of this State; that he had taken the oath and given sufficient bond as such sheriff, as required by law, and that he alone was the sheriff of said county; but these averments are merely the averments of conclusions from facts which are not averred, and of matters of evidence. The relator has not averred, either that he was eligible, or the facts which would show that he was eligible, at the time of the election, to the office in question, nor that, at said election, he had received "the highest number of votes given" for said office

Section 4 of the sixth article of the constitution of this State provides, that "No person shall be elected or appointed as a county officer who shall not be an elector of the county;" and section 2 of the second article of the constitution, as modified by the first section of the fifteenth article of the constitution of the United States, prescribes with clearness and precision the qualifications of an elector. It is very clear, we think, that the appellee's relator could not have acquired any interest in the office of sheriff of Boone county, unless he had been, at the time of said election, an elector of said county, and had received, at such election, "the highest number of votes given" for said office. 1 R. S. 1876, p. 441, sec. 35.

It seems to us, therefore, that the information in this case was fatally defective, on the appellant's demurrer thereto, for the want of sufficient facts, in this, that it did not contain any averment, either that the relator was

eligible, or of the facts which would have shown that he was eligible, at the date of said election, to the office which was the subject of his information ; and in this, that it did not contain any averment, that, at such election, the relator had received the highest number of votes given for said office.

Such averments by the appellee's relator were necessary in order to " show his interest in the matter ; " and such a showing was imperatively demanded by the express terms of section 752 of the practice act, before cited.

Nor do we think that the case is one in which the appellant's proper pleading would have been a motion to make the information more specific in its averments. Such a motion is the appropriate remedy, where an information or complaint contains an averment of a fact which is too general, indefinite and uncertain; but where, as in this case, the proper averment of a necessary fact is wholly omitted from the information or complaint, the defect is one which will be reached by a demurrer for the want of sufficient facts.

For the reasons given, the court below erred, in our opinion, in overruling the appellant's demurrer to the information of the appellee's relator in this case.

The second and third errors assigned by the appellant question the correctness of the decisions of the court below, in sustaining the relator's demurrers to the second and fourth paragraphs of the appellant's answer.

We need not consider either of these alleged errors at any great length. The second paragraph of the answer was a special or argumentative denial of the relator's information. It affirmed or averred matters of fact, which, if true, were utterly inconsistent with the truth of the averments of the information. Every material fact averred in this second paragraph could have been given in evidence under the general denial in the first paragraph of the appellant's answer. And, therefore, if any error was committed in sustaining the demurrer to the second para-

graph of answer, it was at most a harmless error, for which the judgment would not be reversed. *Maxwell* v. *Brooks*, 54 Ind. 98; *Cool* v. *Cool*, 54 Ind. 225; and *Emmons* v. *Meeker*, 55 Ind. 321.

If the fourth paragraph of the answer was intended merely as an answer to the information, it was of the same character as the second paragraph of answer; and, in sustaining the demurrer to this fourth paragraph, the error was harmless, if any was committed. But, if the said fourth paragraph was intended to be a counter-claim or counter-information by the appellant, as would seem to be the case from its prayer for relief, then it was equally defective with the relator's information, and for much the same reasons, and the demurrer thereto was correctly sustained.

We pass now to the consideration of the important and controlling questions presented by the fourth alleged error, the overruling by the court below of the appellant's motion for a new trial. The sixth cause for a new trial, assigned by the appellant in his motion therefor, was as follows:

"6th. Because of error of law, occurring on the trial of said cause, in this: that the defendant demanded a trial of said cause by a jury, which demand was by the court overruled, to which ruling of the court the defendant at the time excepted, and filed his bill of exceptions."

Was the appellant entitled of right to a trial by jury of this cause? Section 20 of the Bill of Rights, in the constitution of this State, of 1851, provides, that, "In all civil cases, the right of trial by jury shall remain inviolate." The same provision is to be found in the fifth section of the first article of the State constitution of 1816. Under these provisions of the organic or fundamental law of this State, as it has existed since the first formation of the State government, it is earnestly insisted by appellee's counsel, that "the appellant was not entitled, as a matter of right, to a jury trial, unless it can be shown,

that, in accordance with the usages of the common law, as it existed when the early American constitutions were formed, such proceedings were triable by jury." It may be conceded, we think, that, by the language used in the constitutions of this State, the right of trial by jury, in all civil cases, was not granted, but was simply secured as a pre-existing right. The clear import of the words used in both constitutions is, that the right of trial by jury, in all civil cases, as such right existed when the particular constitution took effect, should remain inviolate—should continue unchanged. The earliest written law for the government of the territory within the boundaries of this State, was "An ordinance for the government of the territory of the United States north-west of the river Ohio," adopted in Congress, July 13th, 1787. In the first sentence of the second of the "articles of compact between the original States, and the people and States in the said territory," it was ordained and declared, that "The inhabitants of the said territory shall always be entitled to the benefit of the writ of *habeas corpus,* and of the trial by jury; of a proportionate representation of the people in the Legislature, and of judicial proceedings according to the course of the common law." Rev. Stat. of 1843, p. 24.

"Trial by jury" is a judicial proceeding, and therefore it may well be said, that, under this ordinance, "trial by jury" was to be had by the inhabitants of said territory, "according to the course of the common law." This ordinance was the fundamental law of the territory within the boundaries of this State, in force at the time of the adoption of the State constitution of 1816, and, therefore, when it was provided in the fifth section of the first article of that constitution, that "the right of trial by jury shall remain inviolate," it was meant and intended thereby, that the right, as it then existed under the ordinance of 1787, should remain inviolate, "according to the course of the common law."

This conclusion is in perfect harmony with the recent decision of this court, in the case of *Allen* v. *Anderson,* 57 Ind. 388, in which it was held, BIDDLE, C. J., delivering the opinion of the court, in construing said section 20 of the first article of the constitution of this State, of 1851, that "This provision of the constitution was adopted in reference to the common-law right of trial by jury, as the language plainly imports, namely, that the right 'shall *remain* inviolate,' that is, continue as it was."

We do not doubt that this is the proper construction to be placed upon this fundamental and constitutional guaranty to the inhabitants of this State, as the same is found in the ordinance of 1787, and in each of our State constitutions, that the right of trial by jury, "according to the course of the common law," should remain inviolate, should never be restricted or denied, and should continue unchanged. . .

We are not inclined, however, to adopt the position assumed by the appellee's counsel, in this case, that the appellant was not entitled, as a matter of right, to a trial by jury, unless it could be shown that an information in the nature of a *quo warranto* was triable by jury, under the common law as it existed at the time of the adoption of the early American constitutions, or more properly speaking, perhaps, at the time of the enactment by Congress of the Ordinance of 1787. We do not mean to say, that such an information was not triable by jury, under the common law as it then existed; for we incline to the opinion, that the weight of authority is decidedly in favor of the position, that, at the common law, such an information was triable by jury. It is a mooted question, however, and has been ably and elaborately argued, pro and con, by the counsel in this cause. As the decision of this question is not necessary, in our opinion, to the determination of the appellant's right to demand a trial by jury of this cause, under the law of this State, we pass the question by without decision, and with a mere ex-

pression of our opinion, as to the weight of the authorities. For the convenience of those who may be interested in the examination of this question, we cite here some of the authorities referred to by counsel in support of their respective views. Appellant's counsel, to show that issues of fact in cases of this character were tried by jury, cites the following cases :

*Nevill* v. *Payne,* Cro. Eliz. 304 ; *Rex* v. *Higgins,* 1 Vent. 366 ; *The King* v. *The Mayor of London,* 1 Show. 251, 274 ; *The King* v. *Carpenter,* 2 Show. 47 ; *The King* v. *Jones,* 8 Mod. 201 ; *The King* v. *The Mayor of Whitchurch,* 8 Mod. 210 ; *The King* v. *Bridge,* 1 W. Black. 46 ; *Rex* v. *Philips,* 1 Burr. 292 ; *Rex* v. *Malden,* 4 Burr. 2,135 ; *The King* v. *Francis,* 2 T. R. 484 ; *Rex* v. *Bennett,* 1 Stra. 101 ; *Rex* v. *Bell,* 2 Stra. 995.

And, to show that such cases are triable by jury in the United States, the appellant's counsel have cited the following cases :

*The People* v. *Van Slyck,* 4 Cow. 297 ; *The People* v. *Ferguson,* 8 Cow. 102 ; *The People* v. *Vail,* 20 Wend. 12 ; *The People* v. *Cook,* 8 N. Y. 67 ; *The People* v. *The Albany, etc., R. R. Co.,* 57 N. Y. 161 ; *The People* v. *The Albany, etc., R. R. Co.,* 5 Lans. 25 ; *The Commonwealth* v. *Woelper,* 3 S. & R. 29 ; *The Commonwealth* v. *The Delaware, etc., Canal Co.,* 43 Pa. State, 295 ; *The Commonwealth* v. *Smith,* 45 Pa. State, 59 ; *The People* v. *Sackett,* 14 Mich. 243 ; *The People* v. *Cicott,* 16 Mich. 283 ; *The People* v. *Doesburg,* 16 Mich. 133 ; *Harbaugh* v. *Cicott,* 33 Mich. 241 ; *The State* v. *Messmore,* 14 Wis. 115, 163 ; *The State* v. *Stumpf,* 23 Wis. 630 ; *The State* v. *Olin,* 23 Wis. 309 ; *The State* v. *Baker,* 38 Wis. 71 ; *The State* v. *Allen,* 5 Kan. 213 ; *Wammack* v. *Holloway,* 2 Ala., N. S., 31 ; *Kane* v. *The People,* 4 Neb. 509 ; *The Territory* v. *Pyle,* 1 Or. 149 ; *The State* v. *Funck,* 17 Iowa, 365 ; *The U. S.* v. *Addison,* 22 How. 174 ; *The U. S.* v. *Addison,* 6 Wal. 291 ; *The Commonwealth* v. *Fowler,* 10 Mass. 290, on p. 299 ; *The State* v. *Tudor,* 5 Day, 329 ; *The State* v. *The Norwalk, etc., T. P. Co.,* 10

Conn. 157; *The State* v. *Brown,* 34 Miss. (5 Geo.) 688;. *The Commercial Bank* v. *The State,* 4 Sm. & M. 439; *The People* v. *Jones,* 20 Cal. 50; *The People* v. *The Hillsdale, etc., T. P. R. Co.,* 23 Wend. 254.

The learned counsel of the appellee have cited, as directly in point, the cases of *The State* v. *Vail,* 53 Mo. 97, and *The State* v. *Lupton,* 64 Mo. 415, in each of which it was held,. that, in cases of information in *quo warranto,* the defendant had no constitutional right to a trial by jury. See,. also, the case of *The State* v. *Johnson,* 26 Ark. 281. The most of the authorities cited by appellee's counsel, in this. connection, are in support of the position that the provision in the State Constitution of 1816, that the right of trial by jury should remain inviolate, had reference to the right of trial by jury as it existed under the common law. In this position counsel are so clearly right, in our opinion, that we deem it unnecessary to cite their authorities in its support.

In discussing the subject now under consideration, the appellee's attorneys say :

" There can be no doubt that the Legislatures of the several States possess undoubted power to make any action, legal, equitable or criminal, triable by jury; and,. where the right has been exercised in granting a right to demand a jury as of right, the question is no longer open to argument, nor is there any room for construction of constitutional provisions or statutory enactments."

In this view of the matter we fully concur with the counsel ; and it seems to us, that this " undoubted power" has been so exercised by the General Assembly of this State, in the legislation relating to and connected with informations in the nature of *quo warranto* proceedings,. as that we must hold, that the right to a trial by jury, in such proceedings, as matter of right, is a question no longer open to argument in this State. This right to a. jury trial, in such cases as this, has been so often, so long and so fully recognized and provided for, in and by the:

legislation of this State, and in and by the decisions of this court, as an existing, unquestioned and unquestionable right, that, in our opinion, it must now be regarded as an established right which can not be denied when demanded.

Almost the earliest legislation of this State on the subject of *quo warranto* proceedings was a special act, approved December 31st, 1821, to authorize a suit to be brought by, and in the name of, the State of Indiana, in the nature of a *quo warranto* proceeding, against The State Bank of Indiana, of Vincennes. The right of trial by jury was not given nor granted by that act, for that particular case; but it is clear, from the provisions of section 2 of said act, that there was then no doubt in the minds of that General Assembly, as to the right of the defendant in the suit thereby authorized to demand a trial by jury, as a right then existing, clear and unquestioned. In this section 2 of said act the defendant's right to a jury trial was expressly recognized; for, in the only allusion to that subject, it was only and merely provided, "That no person interested, either as a stockholder, creditor or debtor of said bank, shall be deemed and taken as a qualified juror, on the trial of said cause."

The suit authorized by that special act was brought in the Knox Circuit Court, was there tried by a jury, and from the judgment there rendered the cause was appealed to, and decided by, this court, and was reported by BLACKFORD, J., under the title of *The President, Directors, and Company of The Bank of Vincennes, The State Bank of Indiana,* v. *The State of Indiana,* 1 Blackf. 267, the first volume of the Reports of the decisions of this court.

It is observable, and indeed would be remarkable on any other hypothesis than that the right to a jury trial in *quo warranto* proceedings was then regarded by the legal profession as an established, existing and undoubted right, that, while the special act of the Legislature authorizing that suit certainly did not grant, but merely rec-

ognized, the right to a jury trial as an existing right, and while the legal luminaries and giants of that early day in the history of this State—such lawyers as Tabbs and Test, and Moore, Dewey and Nelson, all distinguished for their learning and ability—were engaged as counsel in that cause, and while almost every conceivable point that could possibly arise in the progress of the case was clearly and fully presented, discussed and considered, yet it does not appear from the report of the case that the defendant's right to a trial by jury, as a matter of right, was in any manner doubted, disputed or called in question, either in the court below or in this court.

We pass now to the examination and consideration of the general legislation of this State in relation to informations in the nature of *quo warranto* proceedings.

The first legislation of this State of a general character, on the subject of such proceedings, was " An act to render the proceedings upon writs of *mandamus* and informations, in the nature of *quo warranto*, more speedy and effectual," approved January 21st, 1820.  Laws of 1820, p. 153.

This act seems to have been omitted from the Revised Statutes of 1824, which revision contains nothing on the subjects of either mandate or *quo warranto;* but said act of 1820 was brought forward and set out in the Revised Statutes of 1831, page 368.  This act was entirely silent as to the mode of trial of an information in the nature of a *quo warranto.*

The next legislation on this subject was an act entitled " An act in relation to proceedings upon writs of *mandamus* and informations in the nature of *quo warranto,*" approved February 19th, 1838.  Rev. Stat. 1838, p. 407.

In this act also, nothing was said about the mode of trial of an information in the nature of *quo warranto.*

In the Revised Statutes of 1843, article 2 of chapter 48 is devoted wholly to, and treats of, informations in the nature of *quo warranto.*  From the provisions of the dif-

ferent sections of this article, it is clear to our minds, that such informations, as to the pleadings therein, the making up of issues, either of law or of fact, and the mode of trial of issues of fact were placed upon precisely the same footing as "personal" or "civil actions." Such an information, although in form and name of a criminal character, is and has always been regarded in this State as essentially a civil action or proceeding. It was so regarded by this court in the case of *The State Bank* v. *The State*, 1 Blackf. 267, before referred to.

In section 47 of said chapter 48 of the Revised Statutes of 1843, it was provided, that, when such an information was filed, a summons should be issued thereon, and served and returned "in like manner as in personal actions." Page 935.

Section 64 of said chapter 48 was as follows:

"Sec. 64. The parties may plead, and the issues shall be made up, and issues of law and fact may be tried, and continuances be granted, and further time be allowed to plead, as in personal actions." Page 938.

Section 57 of said chapter 48 was as follows:

"Sec. 57. All issues of fact or of law that shall be joined between the parties shall be determined as in personal actions; and the party in whose favor judgment shall be rendered, may have execution for any damages and costs, or either, that may be adjudged to him, in the same manner as in personal actions." Page 937.

It can not be questioned nor doubted, as it seems to us, that, under these legislative provisions, either party to an information in the nature of a *quo warranto* had the right to demand a trial by jury of any issue of fact therein, as a matter of right. These statutory provisions remained in full force, and the right thereby given to demand a trial by jury, as a matter of right, of all issues of fact in *quo warranto* proceedings, continued to be and was the law of this State, until and at the time of the adoption of the constitution of this State of 1851. This

being so, it might well be said, that, in our opinion, when the people of the State of Indiana ordained the constitution of 1851, and therein declared, that, "In all civil cases the right of trial by jury shall remain inviolate," this declaration fairly included within its purview and meaning the right, as it then clearly existed, under the statutory provisions aforesaid, of either party to an information in the nature of a *quo warranto* to demand, as of right, a trial by jury of any issue of fact therein.

The General Assembly of this State, at its first session after the adoption by the people of the constitution of 1851, passed an act entitled "An act to revise, simplify and abridge the rules, practice, pleadings and forms in civil cases in the courts of this State—to abolish distinct forms of action at law, and to provide for the administration of justice in a uniform mode of pleading and practice, without distinction between law and equity," approved June 18th, 1852. We give the title in full of this act, that it may be seen therefrom that it relates only to civil cases.

As article 44 of this act contains the legislation now in force on the subject of informations in *quo warranto* proceedings, it may be properly regarded as the settled law of this State, that such informations are purely and simply " civil cases." This article 44 of the code of civil practice has never been amended nor repealed, as to any of its provisions, and is still the law of this State on the subject-matter thereof.

Section 753 of the practice act, in said article 44, provides as follows:

" Sec. 753. Whenever an information is filed, a summons shall issue thereon, which shall be served and returned as in other actions. The defendant shall appear and answer, or suffer default, and subsequent proceedings be had as in other cases." 2 R. S. 1876, p. 300.

It is clear, we think, from this section of the code, that an information in the nature of a *quo warranto*, in this

.State, is a civil action; and it is equally clear, that issues ·of fact in such action are triable in the same modes as .such issues are triable in other civil actions.

Section 320 of the civil practice act provides as follows: "Sec. 320. Issues of law must be tried by the court. Issues of fact must be tried by a jury, unless a jury trial is waived." 2 R. S. 1876, p. 164.

We have no doubt whatever, that, under these statutory provisions, the appellant was entitled, of right, to demand ·a trial by jury of the issues of fact in this cause; and therefore we hold, that the court below erred in over-·ruling and refusing the appellant's demand for a trial by jury of the issues of fact joined in this case.

It is suggested by the appellee's attorneys, that, even ·if the court below erred in overruling the appellant's de-·mand for a jury trial, the error would be harmless for the reason, as we understand them, " that the appellant ·was not injuriously affected by such ruling." We can ňot concur in this view of the question. In our opinion ·the appellant was deprived, by the decision of the court below, of the right guaranteed to him by the constitu-tion and laws of this State, of a trial by jury of the issues ·of fact in this case. We can not say that this decision ·did not injuriously affect the appellant; but, if we could, we would be very loth to hold that the error was harm-·less.

The case of *Shaw* v. *Kent*, 11 Ind. 80, is in point on this ·subject. In that case, it was suggested, " that, as sub-·stantial justice has been done between the parties, accord-ing to their respective rights, the court ought not to dis-·turb the proceedings for mere irregularities not touching ·the substantial rights of the case."

In commenting on this suggestion, WORDEN, J., in de-·livering the opinion of the court, aptly said:

" We may remark, in reference to this point, that al-·though we might be satisfied that a full and fair trial was ·had, and that full and ample justice had been done by the

court in reference to the merits of the case, this would not authorize us to affirm the judgment. The right of a trial by jury is guaranteed to parties by the constitution and laws of the State, and of this right they can not be deprived in any case, upon the ground that the court fairly tried and correctly determined it."

We fully approve and concur in the views thus expressed. See, also, on this subject, the cases of *Clem* v. *Durham*, 14 Ind. 263, and *Hamlyn* v. *Nesbit*, 37 Ind. 284.

We come now to the consideration of the questions presented by the alleged errors of law occurring at the trial and excepted to by the appellant, in relation to the exclusion of offered evidence. The seventh cause assigned by the appellant for a new trial of this action was as follows:

"7th. For error of law occurring on the trial of said cause, in this; that, on the trial of said cause, the defendant, Edward Reynolds, to sustain his cause of defence, offered to prove by Reuben Eaton, the inspector, James Mullikin and Frank C. Phillips, the two judges, Firm Allen and O. G. Curtis, the two clerks of said election, and William Brenton, the present trustee, that the said ballots, tickets or votes, as they were counted, were strung on a twine string and deposited in the ballot-box of said township, and retained by the said Reuben Eaton, as township trustee of said Clinton township, until his term of office expired, and were then delivered to the said William Brenton, who was his successor in office, in and to the office of trustee of said Clinton township, Boone county, Indiana, and who is still the regular acting trustee thereof, and have remained in his possession ever since that time, and to identify said ballots by said witness" [witnesses] "and introduce and give said ballots, tickets or votes in evidence; to the introduction of which evidence the plaintiff objected, which objection was sustained by the court, to which ruling of the court the defendant at the time excepted."

As applicable to this alleged error, we set out, in this connection, the evidence of said Reuben Eaton, the inspector of the election held in Clinton township of said Boone county, Indiana, on the second Tuesday, the 10th day, of October, 1876, as follows:

"I was, on the tenth day of October, 1876, trustee within and for Clinton township, in the county of Boone, in the State of Indiana, and acted as inspector, on that day, of the election held in Clinton township, in Boone county, State of Indiana. James Mullikin and George N. Goble were sworn as judges of the election in Clinton township, Boone county, Indiana, and O. G. Curtis and Firm Allen were sworn to act as clerks of the same election. There was an election held in Clinton township, on the tenth day of October, 1876, and the persons I have named acted as the officers of the election. The election was held at the place designated for holding elections in Clinton township. Goble got sick, and Frank C. Phillips was called and sworn to act in his place, and did act in his place. The Republican party is the largest in Clinton township, and the Independent next, and the Democratic next. The Republican and Independent parties are the two political parties having the largest number in Clinton township. The officers selected to hold the election in Clinton township were Independents and Republicans, two Independents and three Republicans; I, myself, being a Republican; Phillips, Allen and Goble are Independents; Mullikin and Curtis are Republicans. After four o'clock in the afternoon we commenced to count out the ballots. I took them out of the ballot-box, and handed them to Phillips, and he gave them to Mullikin, and Mullikin put them on a twine thread. Each of the clerks kept a poll-book, and wrote the names of the voters as they were called, and kept tally-sheets of the count of the ballots; and after the ballots were all counted and put upon a string, they were put back in

the ballot-box, and the box was locked up, and the tally-sheets and poll-books were given to me, and I took the box and tally-sheets and poll-books to my house. All of the officers of the election were resident freeholders and householders of Clinton township. After we got all the ballots that were cast counted, a certificate of the result was written and signed by the board."

At this point a box was pointed out to witness, and witness stated, on oath, as follows:

"This is the box that the ballots were deposited in after they were counted and placed upon a string, as I have stated, and no other ballots were put in the box than those counted and placed upon the string. There were no ballots placed upon the string, except those that were cast by the different voters at the election, on the tenth day of October, 1876, in Clinton township. The poll-books and tally-sheets were all completed, and certificate of result made and signed; and, on Wednesday night, between eleven and twelve o'clock, after the election, some person came to my house and gave me an order for the poll-books and tally-sheets and certificate, and I gave him the tally-sheets and poll-books. I did not know the man at that time. I think I have seen him since. His name is Ayers Taylor. I have got the order; here it is."

Here the order was offered and read in evidence, in the following words and figures, to wit:

"LEBANON, IND., Oct. 11, 1876.

"REUBEN EATON: Sir, Send or bring all the papers in your hands, of Clinton, to-night; don't fail, by all means.

(Signed,) "E. T. LANE, Chairman."

Witness continued his testimony, as follows:

"I had gone to bed; the man did not stay more than five minutes. I saw but one man. I came to Lebanon early next morning, which was Thursday after the election. I then went back and hunted up Phillips, Goble, Curtis, James Mullikin and Allen, the clerks and judges of the election, and got them to come to Lebanon. Mul-

likin came by my house, and I gave him the ballot-box that contained the ballots that had been cast, counted and placed on the twine string on the day of the election. That box, sitting there, is the box. I kept the key to the box. Mullikin came to Lebanon in a buggy, and brought the box; I came to Lebanon in a spring wagon. When I came here I went into the clerk's office and saw the box—this same box. I took the key and opened the box, and I, and Phillips, Curtis, Goble and Allen counted the ballots that were in the box. We made a tally-sheet of the count of the ballots, as we counted them."

Here a tally-sheet was presented to the witness, and witness stated :

" That is the sheet we made out. We found the same number of ballots in the box that we had counted and strung and placed in the box. I have never seen the poll-books and tally-sheets and certificate, since I gave them up to the man that got them on the order. I do not know where they are. I have hunted for them, and tried to find where they are. I can not find them. When my term of office expired I gave the ballot-box, containing the same ballots we counted, to William Brenton, my successor in office. I know that the ballots were not changed while the box was in my hands or in my possession. I know that no person knew where the box containing the ballots was, not even my wife; for I had it hid in a barrel, among some rags, and it was there, just as I had placed it, when I went to get it to give it to Mullikin, and when I took it home, after we had it at Lebanon, I hid it again, until I gave it to my successor. I saw the ballots put back in the box here in Lebanon, and the box was then locked up and given to me."

On cross-examination, said Reuben Eaton testified :

" Some person came to my house, about eleven or twelve o'clock on Wednesday night after the election, and I gave the tally-sheets and poll-books to him. I did not know the man at that time. I have since seen a man

that I thought was he.   No person pointed out Taylor to me as the man.   I saw him, and knew him.   I have never demanded of him the poll-books, tally-sheets or certificate which I gave him as I before stated; nor have I ever asked him any thing in reference thereto.   Clinton township is in Boone county, State of Indiana, and joins Center on the north.   Lebanon is in Center township, Boone county, Indiana.   There are twelve townships in Boone county, Indiana, and twelve voting precincts."

James Mullikin, one of the judges of said election in Clinton township, testified on the trial, in the court below, to the same effect as said Reuben Eaton, with regard to said election, the counting of the ballots, the stringing of the ballots on a twine string, and that, " After we were done counting the votes, Reuben Eaton, the trustee, put the ballots, just as they were strung, in the ballot-box, and locked them up, and took the box with him.   I did not see the box any more, until on the night of Thursday, October 12th, 1876, when Reuben Eaton gave me the box to bring to Lebanon.   It was locked when he gave it to me.   I did not have the key.   I brought the box in my buggy to Lebanon with me.   I set the ballot-box on a shelf in the clerk's office, and watched it until Reuben Eaton came, when I delivered it to Eaton again, just as it was when Eaton delivered it to me.   I know that it was not opened or tampered with while it was in my possession."

William Brenton testified, on the trial of this cause in the court below, as follows:

" My name is William Brenton.   I live in Clinton township.   I am trustee for that township.   I was elected at the October election, 1876, as the successor of Reuben Eaton.   After I had taken the office, and a few days before the November election, 1876, Reuben Eaton turned over to me the ballot-box of Clinton township.   It had in it the ballots of the October election.   It was locked. He gave me the key just before the November election.

I opened the ballot-box. I found in it the ballots of the October election; they were strung on a thread. I took them out and placed them in an old ballot-box and locked it. I took them out of the ballot-box, so that I could use the box for the November election. Shortly after the November election, I took the ballots of the November election out of the ballot-box; and I took the ballots of the October election out of the old ballot-box and put them in the other box again. I did not unstring them. I did not change any of them. I then locked the ballot-box. The ballot-box has been in my possession ever since, with the ballots in it. I have them just as I received them from Reuben Eaton. I have the ballot-box, with the ballots of the October election in it, just as they were given to me by Eaton. I have them here with me in court. This is the box."

The evidence of these three witnesses, Eaton, Mullikin and Brenton, is fortified and sustained by other evidence in the record; but it is not contradicted nor impeached, in any important or material particular, by any evidence adduced upon the trial. The question for decision, therefore, may be thus stated: Upon the evidence of said three witnesses, were the ballots of the October election, 1876, in said Clinton township, so identified as to render them admissible and competent evidence on the trial of this cause? It seems very clear to us, that this question must be answered in the affirmative. In all cases wherein the right to an elective office is the subject-matter of an action, whether the right is to be determined in and by the statutory proceeding to contest an election, or in and by an action in the nature of a *quo warranto*, the ballots of the electors, voted at such election, are the primary and original evidence of the result thereof. That this is so is abundantly and clearly shown, we think, by the statute of this State on the subject of elections. In section 26 of "An act regulating general elections, and

prescribing the duties of officers in relation thereto," approved June 7th, 1852, it is provided, as follows:

"Sec. 26. When the polls are closed, or at any time after four o'clock of the afternoon on the day of the election, when the judges are at leisure, they may open the ballot-box and commence counting the votes; when the ballots shall be taken out carefully, one by one, by the inspector, who shall open them as he takes them out, and read aloud the name of each person printed or written thereon, and the office for which every such person is voted; he shall then hand the ballot to one of the judges, who shall examine the same, and hand it to the other judge, who shall string it on a thread of twine." 1 R. S. 1876, p. 440.

In this section, it will be seen that provision is made for the preservation of the ballots, and the mode thereof. In the last sentence of section 39 of the same act, the object and purpose of preserving the ballots are stated as follows:

"The other papers and ballots shall be kept by the inspectors for the term of six months, except when such election is contested, then they shall be preserved, subject to the order of any court trying such contest until the same is determined." 1 R. S. 1876, p. 442.

Manifestly, we think, it was the legislative intent, in the enactment of this provision, to preserve the ballots cast at any general election for the use, and subject to the order, of the proper court, as the primary and best evidence in the determination of the rights of contesting parties to any elective office in the gift of the people. The ballot is the voice of the elector at the polls, and when preserved in the mode prescribed by the statute, it speaks the exact truth in regard to the will of the elector, as expressed on the day of the election, and thus affords the very best and most reliable evidence as to the matter in issue.

The certified statement and declaration made by the

officers of an election as to the result thereof, are merely *prima facie* evidence of the correctness of such result; but the ballots cast at such election, when preserved as the law provides, afford the only conclusive evidence of the result of such election. The statute requires the board of canvassers of a general election to make and certify a statement and declaration of the result of such election; but it does not, in express terms, make such certified statement and declaration even *prima facie* evidence of the contents thereof, and certainly there is nothing in the statute to indicate that such statement and declaration were to be received as conclusive evidence of any matter therein contained or referred to.

"It is a primary rule of elections that the ballots constitute the best, the primary evidence of the intentions and choice of the voters: *State ex rel.* v. *Judge, etc.*, 13 Ala. 805; *People ex rel.* v. *Holden*, 28 Cal. 123; McCrary on Elections, secs. 291, 439; Cooley's Const. Lim., p. 625;" *Hudson* v. *Solomon*, (Kansas,) Am. Law Reg., Feb. 1878, p. 104.

In the California case above cited, the court say: "Intrinsically considered, it must be conceded by all that the ballots themselves are more reliable, and therefore better evidence than a mere summary made from them. Into the latter errors may find their way, but with the former this can not happen. The relation between the two is at least analogous to that of primary and secondary evidence."

It seems to us that where, as in this State, the statute expressly provides for the preservation of the ballots by a particular officer, for the specific purpose of determining the right to a public office, then the ballots become, of necessity, the highest and best evidence under the law, for that purpose.

It can not be doubted, we think, from the evidence before set out, of the witnesses Eaton, Mullikin and Brenton, that the ballots cast at the October election, 1876, in Clinton township, were "preserved," within the meaning

Reynolds *v.* The State, *ex rel.* Titus.

of the statute, and therefore we hold, that the court below erred in its decision sustaining the appellee's objections to the appellant's offer of said ballots in evidence, and excluding said ballots as evidence, on the trial of this cause.

The first and most important rule in the production of evidence "is that which requires the best evidence of which the case in its nature is susceptible." 1 Greenl. Ev., sec. 82 *et seq.*

As we have seen, the primary and best evidence, in an action to determine the right and title to a public office, is the ballots cast at the election, where, as in this case, the point in issue is, as to which one of two persons has received the highest number of legal votes. Where, as in this State, the statute regulating elections expressly requires that the ballots cast at an election shall be kept and preserved by a certain officer for the use, and subject to the order, of the proper court, to be used on the trial of a contested election, it is clear, as we think, that such ballots must be regarded as " the best evidence of which the case in its nature is susceptible." Where, as in this State, it is shown to the court or jury trying the cause, by sufficient legal evidence, that the ballots cast at the election have been kept and preserved as the statute requires, then it seems to us, that oral testimony would not be admissible to prove any matter of fact of which the ballots would afford the best evidence.

The will of the people in the selection of a public officer is not to be frustrated, and the right or title of any one to a public office to which he has been duly and legally elected is not to be defeated, by the loss or destruction of any or all of the papers or ballots pertaining to such election. If, in this case, the evidence on the trial had shown the total loss or destruction of all the papers pertaining to, and of all the ballots cast at, the October election, 1876, in Clinton township, in that event, we think that the appellant might have shown by the oral

testimony of each of the qualified voters of said township, who voted at said election, for whom he voted for the office of sheriff of Boone county, as secondary evidence of the matter in issue. But as it was shown by sufficient legal evidence, that the ballots cast at said election had been kept and preserved in the mode prescribed by the statute, and were therefore the best evidence of the matter in issue, and were then present in court and offered as such evidence, it seems to us that no case was made by the appellant for the introduction of secondary evidence, and therefore no error was committed by the court below in the exclusion of such secondary evidence.

We have now considered and decided the salient and most important questions presented by the record of this cause, and the appellant's assignment of errors thereon. Other alleged errors of law occurring at the trial and excepted to are complained of by the appellant in this court; but as these errors, if they exist, may not occur again upon another trial of this cause, we deem it unnecessary for us now to consider or decide the questions thereby presented.

The judgment is reversed, at the costs of the appellee's relator, and the cause is remanded with instructions to sustain the appellant's demurrer to the relator's information, and for further proceedings in accordance with this opinion.

Petition for a rehearing overruled.